110 So.2d 643

## DEPARTMENT OF INDUSTRIAL RELATIONS

v.

## Mary Lou MEEKS.

### 7 Div. 491.

Court of Appeals of Alabama.

March 31, 1959.

**232**

J. Eugene Foster and Richard S. Brooks, Montgomery, for appellant.

Love & Hines, Talladega, for appellee.

PRICE, Judge.

This is an appeal from a judgment of the Circuit Court of Talladega County awarding the appellee, Mary Lou Meeks, unemployment compensation.

The claim was denied in the administrative processes of the applicable law.

█ It was stipulated on the trial that the only question involved is whether or not claimant left her work voluntarily without good cause connected with such work. Subsection B, Section 214, Title 26, Code 1940 as amended.

The following tendencies of the evidence are taken from appellant's brief:

"The appellee, Mary Lou Meeks, commenced working for the appellant-employer, Stretch-Tex Company, a textile mill located at Talladega, Alabama, on or about May 28, 1952. She was employed as a winder on the second shift, that is, from 3:00 p. m. to 11:00 p. m. until on or about November 16, 1955, when the Company, as a result of a slack season, felt it necessary to reduce the number of its employees. Rather than to indiscriminately lay off the necessary number of new employees with less seniority than others, the Company offered certain of its older employees, that is, those with sufficient seniority, so as not to be disturbed by the layoff, the opportunity of choosing to be laid off and to draw unemployment compensation benefits, or to continue undisturbed in their regular employment. The appellee was among those employees who chose to be terminated.

"On or about December 12, 1955, there was a substantial increase in the number of orders the Company received and the Company called back to work the appellee and the other employees who had been temporarily laid off.

"At the time appellee was called back, she was placed on the Company's first shift and assigned to winding, the same job she had when she was laid off on November 16, 1955. She worked on the first shift until on or about April 15, 1956, when she was transferred back to the second shift, the shift she initially worked on when first hired. At the time of this transfer she stated that she thought she would prefer working on the second shift, because, since her husband worked on the first shift, the new hours of work would make it possible for one of them to be with their children at all times when they were at home from school. Appellee worked on this shift until about five or ten minutes of 4:00 o'clock on the afternoon of May 17, 1956.

"On said afternoon, when appellee reported to her work, she found no yarn on her looms. She did not notify her supervisor that her looms were down, and he did not discover this fact for some forty-five minutes after the shift had started working, when the yarn boy approached him in another section of the mill and informed him that Mrs. Meeks did not have anything on her job and was just standing there mad. The supervisor went to the appellee and told her that she would have to run the frame next to hers, a six-spindle frame, which paid a straight hourly rate of $1.25. He also told her that she would receive "down time" at the rate of $1.25 per hour for the forty-five minutes her frame was down, but cautioned her not to let this happen again, as it put him in an awkward position to explain why the looms were down.

"Shortly thereafter when the supervisor left, the appellee, while she was still mad, commenced crying and walked off the job. As she walked to the Company's time record clock, she passed the mill Superintendent, who was talking to Mr. Roberts, the Presi-

dent of the mill. The Superintendent asked appellee what was wrong, but she did not answer his inquiry. Later that afternoon the Superintendent telephoned appellee at her home, but was told by her little girl, who answered the telephone that "She is not here". The Superintendent then went to the winding department of the mill where he had a conversation with the appellee's sister, Mrs. Jackson. He asked Mrs. Jackson to tell appellee that he would like for her to come out the next morning to see him, or to telephone him. Mrs. Jackson said she was sorry appellee had gotten mad and walked out, and asked if he would put her back to work. The Superintendent told her that he would, but that he could not have her walking off the job like she did. The appellee telephoned the Superintendent the following morning and was told that she could come back to her job that afternoon if she wanted to, but she informed the Superintendent that she would not do it.

"Some three weeks thereafter the appellee telephoned the Superintendent and told him she had signed for her unemployment compensation benefits. She asked him what he was going to put on her separation papers as the reason for her leaving her job. Upon the Superintendent's informing her that the only reason he could put on her separation papers was the fact that she had quit, she then said that she would come back to work if he would put her on the first shift, to which he replied that he could not promise that."

No brief has been filed for appellee, but we have carefully considered all the evidence adduced on the trial, upon the theory that appellee is interested in having her judgment sustained. Tri-City Gas Co. v. Britton, 230 Ala. 283, 160 So. 896; McLeod v. Willard, 257 Ala. 672, 60 So.2d 692; Department of Industrial Relations v. Savage, 38 Ala.App. 277, 82 So.2d 435.

Claimant testified that when she returned to work after the layoff she was told she was to work as a back winder and she expected to be paid $1.25 per hour but after three or four days she was put back on a job as regular winder and that she was frequently moved from one machine to another and she felt she was being treated as a sort of "spare hand." She further testified her earnings were reduced due to these frequent changes and because of changes in pay rates, but admitted she always made "production."

She further testified she quit work on May 17, 1956, that she felt it was the supervisor's fault that her machine was idle and when he told her several times, "Just don't ever let this happen again, * * * it's going to look bad on my part", and that he didn't know how he could explain it on his report. She felt he should not talk that way to her and that she started crying and he walked away.

The next morning she told the plant manager she would come back to work if he would give her the day shift, and as she remembered it all he said was, "Do you want to come and pick up this check or do you want me to mail it?" and she felt he fired her then.

The company's plant manager and claimant's supervisor testified she was not discriminated against; that she was not changed from one type of yarn to another more frequently than other winders; that her wages were never cut; that the company spins yarn according to customer's orders and, when an order is filled and another order requires a different type of yarn winders are often moved from one machine to another to avoid changing the machine.

When the evidence shows that a claimant left his or her employment voluntarily, claimant has the burden of showing good cause connected with such work for leaving. Henderson v. Department of Industrial Relations, 252 Ala. 239, 40 So.2d 629.

We are of opinion that the claimant under the evidence did not have good cause for leaving her employment and that the trial judge was in error in awarding unemploy-

ment benefits. Avondale Mills v. Burnett, 268 Ala. 82, 106 So.2d 885.

It is ordered that the judgment of the court below be reversed and the cause remanded.

Reversed and remanded.